## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **BOB CALDWELL AUTOMOTIVE, INC.** | |
| **Plaintiff,** | |
| **v.** | **No. 2:22-cv-2067** |
| **MEREDITH RATLIFF, TIMOTHY RYAN, and MCHUGH, INC. d/b/a MCHUGH CHRYSLER DODGE JEEP RAM FIAT,** | |
| **Defendants.** | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF
## AND MONETARY DAMAGES

Plaintiff Bob Caldwell Automotive, Inc. ("Caldwell" or "Plaintiff"), by and through its counsel, bring this Verified Complaint for Injunctive Relief and Damages against Defendants Meredith Ratliff ("Ratliff"), Timothy Ryan ("Ryan"), and McHugh, Inc., d/b/a McHugh Chrysler Dodge Jeep Ram FIAT ("McHugh") (collectively the "Defendants") and allege as follows:

### INTRODUCTION

Caldwell and McHugh operate automobile dealerships in Ohio and engage in the highly competitive business of selling and servicing automobiles. Ryan and Ratliff are former Caldwell employees who abruptly left their employment with Caldwell in December of 2020 and January of 2021, respectively, to work for McHugh. Since their resignations, Ryan and Ratliff have embarked on a scheme, individually, and through coordination with McHugh to (1) illegally and surreptitiously log on to Caldwell's private, employees-only, Client Relationship Management database ("CRM") to unlawfully gain continuous access to confidential, sensitive, and proprietary information regarding Caldwell's customers, prospective customers, and its business transactions

and (2) unlawfully recruit and hire close to a dozen Caldwell employees, in violation of Ryan's non-solicitation agreement.

With respect to the misappropriation of Caldwell's trade secrets, Caldwell has discovered that in the fourteen months following the employees' departure, Defendants have initiated over two hundred fifty (250) logins to its CRM from Internet Protocol ("IP") addresses linked to McHugh and have further downloaded private and sensitive information relating to Caldwell's clients and business operations. The information which Defendants misappropriated is valuable, only accessible by a limited number of Caldwell employees, not known outside of Caldwell and only to Caldwell employees, and would be extremely difficult to acquire or independently duplicate. Caldwell has incurred and will continue to suffer significant damages as a result of Defendants' actions. This action seeks, in part, preliminary and permanent injunctive relief requiring Defendants to return and not use any of Caldwell's trade secrets and highly confidential and/or proprietary information.

## THE PARTIES

1. Plaintiff Caldwell is an Ohio corporation with its principal place of business in the State of Ohio. Caldwell maintains a robust automobile sales and service business in Ohio.

2. Defendant Timothy Ryan is an individual who, upon information and belief, resides in the State of Ohio, and is currently employed by Defendant McHugh as a General Sales Manager. As explained below, Ryan is subject to the jurisdiction of this Court.

3. Defendant Meredith Ratliff is an individual who, upon information and belief, resides in the State of Ohio, and is currently employed by Defendant McHugh as a Business Development Consultant Manager. As explained below, Ratliff is subject to the jurisdiction of this Court.

FP 43763825.3

4.     Defendant McHugh, Inc. is an Ohio corporation with its principal place of business in the state of Ohio.  McHugh is subject to the jurisdiction of this Court.  McHugh does business under the trade name "McHugh Chrysler, Dodge, Jeep, Ram, FIAT."

## JURISDICTION AND VENUE

5.     The Court has subject matter jurisdiction over the entire action pursuant to 28 U.S.C. § 1331 because Caldwell is asserting claims for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

6.     The Court has supplemental jurisdiction over Caldwell's additional causes of action under 28 U.S.C. § 1367, which states "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]"

7.     This Court has personal jurisdiction over Ryan, Ratliff, and McHugh under Federal Rule of Civil Procedure 4, since Ryan and Ratliff are residents of Ohio, because McHugh is incorporated in, has its principal place of business in, and is authorized to conduct business in Ohio, and because some or all of the complained of actions of Ryan, Ratliff, and McHugh occurred and caused injury to Caldwell in Ohio.

8.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because both of the individual Defendants are residents of Ohio and the individual defendants reside in this District, McHugh is registered to conduct business and conducts business in the State of Ohio, and the events giving rise to Plaintiff's claims against all Defendants occurred in Ohio.

## FACTUAL ALLEGATIONS

9.     Caldwell is an automobile dealership in Ohio and is engaged in the highly competitive business of selling and servicing automobiles.

10.    Caldwell has spent significant time and expense developing good will and beneficial business relationships with its customers, vendors, and employees.

11.    To that end, Caldwell established and maintains an extensive Client Relationship Management database ("CRM") which contains trade secret, private, sensitive, and confidential information including Caldwell's customer and vendor contact information, Caldwell's customer and vendor transactions, prospective customer's contact information, pricing information, sales histories, histories of individual customer communications, sales strategies, contract terms, etc.

12.    The CRM contains this sensitive and proprietary information and data relating to many customers and potential customers that has been cultivated for well over eight years.

13.    Information stored in its CRM is the backbone of Caldwell's sales and servicing departments and generates substantial economic value for Caldwell.  The data contained in the CRM is highly valuable and proprietary information that Caldwell has compiled at great expense and effort about its customers purchase history, service history, profit/margin, sales volume, contact information, history of communication, sales data, pricing data, and other analytics.  The information contained in the CRM are quintessential trade secrets.  This data is essentially a playbook for how Caldwell has managed each customer account.  This is exactly the type of information a competitor, like McHugh, would need to target these current and prospective customers and solicit these customers from Caldwell to McHugh.

14.    As such, the information in the CRM is Caldwell's trade secret, highly confidential, and/or proprietary information.

15.    To protect its confidential and trade secret information, Caldwell, among other things, maintains robust confidentiality and privacy policies, including but not limited to, (1) prohibiting employees both during and after their employment from disclosing any confidential

and proprietary information; (2) barring employees from using any confidential information obtained during their employment for the purpose of advancing any private interest or for personal gain; (3) and forbidding employees from downloading files of any kind unless prior approval was given.

16.     In furtherance of these aforementioned goals, Caldwell requires appropriate employees to execute employment agreements containing restrictive covenants tailored to protect its valuable company assets, including but not limited to prohibiting employees who separate from Caldwell from soliciting Caldwell customers or employees for a period of two (2) years after separation of employment.

17.     Caldwell, in addition to using employment agreements containing the above-referenced covenants, also uses computer passwords, limits access to confidential information to employees that need the information in order to perform their duties for Caldwell, maintains additional confidentiality policies in its employee handbook, maintains electronic communication and code of conduct policies regarding confidentiality, and stresses the importance of maintaining confidentiality in order to protect its confidential and trade secret information.

18.     Caldwell uses a secure computer network to store and maintain its confidential, proprietary, and trade-secret information.

19.     Caldwell limits access to portions of its secure computer systems to key employees who have a need to access the confidential and trade secret information to perform their job duties, including but not limited to Ryan and Ratliff during their employment with Caldwell.

**RYAN AND RATLIFF'S EMPLOYMENT AND ACCESS TO CONFIDENTIAL INFORMATION**

20.     Caldwell hired Ratliff on March 18, 2016, as the Business Development Center Manager.

5

21.     As a Business Development Center Manager, Ratliff was the link between the Caldwell customer or future customer and the dealership.  Ratliff's job duties included communicating with customers and establishing follow-ups with the Caldwell sales team, corresponding with prospective clients to re-engage interest into the sales process and to provide them with product information and direct them to the appropriate dealership resources.  Ratliff was also responsible for using and updating Caldwell's CRM.

22.     Caldwell hired Ryan on January 10, 2014, as a General Sales Manager.

23.     As a General Sales Manager for Caldwell, Ryan was responsible for customer retention and profitability for the sales department and had oversight responsibility for the employees within the sales department.  Ryan's job duties included hiring and training sales staff and ensuring that the department meets its sales targets and customers' expectations.

24.     Ryan and Ratliff were provided with extensive training and industry knowledge throughout their tenure at Caldwell.

25.     As trusted employees of Caldwell, Ratliff and Ryan were privy to Caldwell's highly sensitive, proprietary, confidential and trade secret information regarding Caldwell's customers and employees.  Both Ryan and Ratliff could view and access information related to clients stored in Caldwell's CRM, including point of contact for the customer, contact information for current and prospective customers, customer account information, the sales team servicing the account, notes related to the vehicle's servicing history, vehicle equity information, historical data including a history of communication with customers and prospective customers, and proprietary internal pricing and sales data.

FP 43763825.3

## THE RYAN AGREEMENT

26.     As part of Ryan's employment with Caldwell, on March 22, 2018, he entered into an Employee Non-Solicitation Agreement (the "Ryan Agreement") (the Ryan Agreement is attached hereto as Exhibit A).

27.     The Ryan Agreement contains, in part, the following acknowledgment regarding trade secrets and confidential information:

> Employee recognizes that as an employee of Caldwell that they are provided with access to sensitive information regarding Caldwell's business operations.  Employee recognizes that the misuse of this information will damage Caldwell and agree to protect this information and to not misuse this information upon the termination of their employment.

> *See* Exhibit A, Ryan Agreement.

28.     The Ryan Agreement contains the following post-employment restrictions regarding solicitation of Caldwell's employees:

> Employee agrees that for a period of 2 years following the termination of their employment that they shall not engage in any activity, directly or indirectly that includes: […]

> 2. Inducing or attempting to induce any employee, director, agent, contractor or other service provider of Caldwell to quit or terminate their employment or business relationship with Caldwell;

> 3. Interfering with or disrupting Caldwell's relationship with its employees, directors, agents, contractors or other service providers;

> 4. Discussing, offering or soliciting employment opportunities or providing information about competitive employment to any of Caldwell's employees, directors, agents, contractors or other service providers; or

> 5. Soliciting, enticing, or hiring away any employee, director, agent, contractor or other service provider of Caldwell.

> *See* Exhibit A, Ryan Agreement.

29.     Additionally, the Ryan Agreement contains the following post-employment restrictions regarding the solicitation of Caldwell's customers:

> Employee agrees that for a period of 2 years following the termination of their employment that they shall not engage in any activity, directly or indirectly that includes:
>
> 1. Contacting any customer or former customer for the purpose of soliciting the purchase, leasing, repair or maintenance of any automotive vehicle.
>
> *See* Exhibit A, Ryan Agreement.

### CALDWELL CONFIDENTIALITY AND DATA PRIVACY PROTECTION POLICIES

30.     Caldwell maintains an employee handbook (the "Handbook") that includes, amongst other provisions, provisions relating to confidentiality and data protection and privacy.

31.     The Handbook contains the following restriction relating to confidential information:

> 6.27 CONFIDENTIAL INFORMATION: Employees have an ethical obligation not to disclose confidential and proprietary information from business transactions and to protect confidential relationships between the Company and its customers and suppliers.  Business information that has not been made public shall not be released to any person or organization unless demanded by legal process such as a subpoena or court order.  Employees shall not use confidential information obtained during their employment for the purpose of advancing any private interest or for personal gain.
>
> As an employee of this Company, you have a duty to protect this information both during and after your employment.  Confidential information includes, but is not limited to, the following examples: customer or vendor transactions; customer or vendor information; lists of actual or prospective customers; customer or company financial information; pending projects and proposals' research and development strategies; data processing and computer programs and operations; marketing and sales strategies; company business methods, processes and systems.
>
> Employees who improperly use or disclose trade secrets or confidential business information to anyone outside of the Company will be subject to corrective action or termination of employment and legal action, even if they do not actually benefit from the disclosed information.  You also may be subject to legal action, even if you are no longer employed by the Company. […]

FP 43763825.3

*See* Exhibit B, Excerpt of Caldwell Handbook.

32.      The Handbook also contains provisions relating to Data Protection and Privacy:

6.28 DATA PROTECTION AND PRIVACY: The Company complies with all applicable data protection and privacy laws.  WE are committed to protecting the confidentiality of the personal data entrusted to us under these laws.  This includes personal data of our fellow employees, customers, suppliers, and other third parties with whom we do business.

As an employee, you have a responsibility to protect the privacy and security of any personally identifiable information that you collect, store, process, transmit, share or dispose of.  Personally identifiable information includes information in personnel records (i.e., social security numbers, dates of birth), medical records, and credit and banking information and does not include information related to wages, hours, or other terms and conditions of employment.  Unless you have permission of the data owner, you should never disclose personally identifiable information with others who do not have a business need to know.  You should never leave personally identifiable information unsecured or in an accessible location.

*See* Exhibit B, Excerpt of Caldwell Handbook.

33.      Further, the Handbook contains a provision that prohibits the downloading of files of any kind, unless work related and prior approval has been secured.

34.      Ratliff and Ryan, as employees of Caldwell, were provided with copies of the Handbook.

35.      Ratliff and Ryan executed documents acknowledging receipt of the Handbook and in so executing, acknowledged that they agreed to comply with the provisions contained within the Handbook. *See* Exhibit C for Acknowledgments of Ratliff and Ryan.

**DEFENDANTS' ACCESS AND MISAPPROPRIATION OF CALDWELL'S HIGHLY SENSITIVE, CONFIDENTIAL, AND TRADE-SECRET INFORMATION**

36.      Ryan resigned his employment with Caldwell on December 17, 2020, and started working for McHugh shortly thereafter.

9

37.     Ratliff resigned her employment with Caldwell on January 6, 2021, and immediately commenced employment with McHugh, in the position of Business Development Consulting Manager.

38.     Upon her hiring at McHugh, without permission or authorization to do so, Ratliff repeatedly accessed Caldwell's confidential, employees-only CRM, to steal Caldwell's proprietary trade secrets, including confidential and sensitive current and prospective contact information, sales and service notes and transactions, and customer history, interaction and preferences in order to solicit Caldwell's customers on behalf of McHugh.

39.     While still employed at Caldwell, Ratliff had administrative rights from Caldwell's vendors in their CRM, including Clarivoy, Inc. ("Clarivoy"). Clarivoy is a marketing technology firm that helps auto dealers with their data analytics.  Clarivoy had access to Caldwell's CRM to run these analytics.  Ratliff's administrative rights to Clarivoy's accounts would provide Ratliff with the authorization to change Clarivoy's password needed to access the CRM.

40.     To gain access to the CRM, Ratliff usurped login credentials from Clarivoy, and used these credentials to gain unauthorized and illegal access to Caldwell's CRM.

41.     Clarivoy provided Caldwell with the Clarivoy-authorized IP addresses it may have used to access Caldwell's CRM system.

42.     Two IP addresses: 76.190.24.218 and 69.135.5.26 were linked to Clarivoy log-ins but were not associated with Clarivoy systems.

43.     Upon information and belief, IP addresses 76.190.24.218 and 69.135.5.26 are registered to McHugh.

FP 43763825.3

44.     Between January 18, 2021 and March 19, 2022, approximately 256 logins to Caldwell's CRM are linked to the two aforementioned IP addresses registered to McHugh.  *See* Exhibit D, Excerpt of Log-in Data

45.     As a result, Ratliff or other McHugh employees have illegally accessed Caldwell's CRM for fourteen months without Caldwell's authorization.

46.     Once Caldwell became aware of this unauthorized access on March 24, 2022, it immediately changed the password to Clarivoy's account.

47.     Since that date, there have not been any logins using Clarivoy's credentials other than those by Clarivoy, using a Clarivoy registered IP address.

48.     Upon information and belief, Ratliff has downloaded sensitive and confidential information she accessed via her unauthorized log-ins, including the sales teams contact list containing contact information of current and prospective customers.

49.     Ratliff neither had authorization to access the CRM once she ceased employment with Caldwell, nor did she have permission to download any of the information contained within the program; and there are no legitimate reasons for Ratliff to access the CRM once she ceased employment with Caldwell.

50.     Upon information and belief, McHugh was working in tandem with Ratliff and using the data and information Ratliff accessed in Caldwell's CRM to solicit Caldwell's current and prospective customers and unfairly compete with Caldwell.

51.     Upon information and belief, Defendants Ratliff and McHugh have been disclosing Caldwell's confidential sales information to outside sources, including the volume of cars Caldwell sold on a particular day, and the amount of revenue or profits Caldwell has earned.

52. The information that Ratliff illegally accessed is exactly the type of data that Ratliff could use at McHugh to compete against Caldwell.

53. Based on Ratliff's knowledge of all the information it illegally accessed and downloaded from Caldwell's CRM, Ratliff is now positioned to assist McHugh in its competitive activities against Caldwell, both, in terms of soliciting Caldwell's prospective and current customers away from Caldwell to McHugh and planning future efforts directly competitive to McHugh.

**DEFENDANTS' ONGOING ILLEGAL SOLICITATION AND POACHING OF CALDWELL EMPLOYEES**

54. Defendants have also engaged in activities to solicit and hire Caldwell's employees.

55. Over the last fourteen months, McHugh has poached many key employees from Caldwell. Many of these employees are subject to post-employment restrictions related to their employment at Caldwell.

56. Further, notwithstanding the prohibitions set forth in the Ryan Agreement, upon information and belief, Ryan has discussed employment, induced or attempted to induce, and solicited Caldwell employees to leave their employment with Caldwell on behalf of McHugh.

57. Since December of 2020, twelve Caldwell employees ceased their employment with Caldwell and immediately became employed with McHugh, many of them due to the recruiting efforts of Ryan.

58. McHugh hired these employees despite being fully aware of some of their post-employment restrictions.

59. McHugh's conduct in this regard is willful and malicious. This conduct is designed and intended to injure Caldwell by inducing Ryan to breach the Ryan Agreement to aid in their poaching efforts by soliciting his former colleagues.

FP 43763825.3

60. McHugh has actual or constructive knowledge of Ryan and Ratliff's misconduct and benefitted from this misconduct.

61. Based on McHugh's utter disregard for Caldwell's contractual obligations with its employees, it is likely that employees within McHugh (acting within the scope of their employment) were aware of Ryan and Ratliff's misconduct and benefitted from Caldwell information that Ryan and Ratliff kept with them and had open access to throughout their employment with Caldwell.

62. This conduct is illegal and ongoing. It has caused (and is continuing to cause) substantial harm to Caldwell.

63. Defendants acted together with a common purpose to injure Caldwell by performing unlawful acts and competing with Caldwell through unlawful means.

64. On March 29, 2022, Caldwell sent cease and desist letters to Ryan and Ratliff and sent copies to McHugh. Caldwell requested that a response be sent by April 4, 2022.

65. On April 5, 2022, Caldwell received correspondence stating that "[o]nce we have had an opportunity to review this matter with Mr. Ryan and Ms. Ratliff, we will send you a response."

66. Despite three inquiries regarding a response, Caldwell has not received any correspondence from Defendants.

## COUNT I
### VIOLATION OF THE DEFEND TRADE SECRETS ACT
### (Against Defendants Ratliff and McHugh)

67. Caldwell re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

FP 43763825.3

68.     The current and prospective customer information, including customer point of contact, private contact information, complete sales histories, service history, historical communication data, and specific pricing that Ratliff surreptitiously accessed on Caldwell's CRM for fourteen months following her departure from Caldwell are trade secrets of Caldwell subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*.

69.     The information and data contained in Caldwell's CRM derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.  Caldwell has spent significant sums, in terms of both financial and human resources, to develop, update and maintain this information, which would be of great value to any competitor, including McHugh.

70.     Caldwell takes, and at all time here relevant, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include restricting availability of confidential information to key employees, requiring key employees to execute agreements with confidentiality provisions and/or restrictive covenants, establishing handbook and IT policies, physical security measures to protect against the disclosure of sensitive materials to third parties, and IT security efforts, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

71.     Ratliff obtained the information contained in Caldwell's CRM by improper means by stealing an authorized user's login credentials, violating Caldwell's IT protocol, and accessing the CRM hundreds of times without consent in direct violation of her obligations to Caldwell.

72.     Upon information and belief, Ratliff secretly downloaded Caldwell's trade secret and proprietary information contained on the CRM while employed by McHugh, a direct competitor of Caldwell.

73.     Ratliff's foregoing conduct constitutes an actual and threatened misappropriation and misuse of Caldwell's trade secret information in violation of the DTSA.

74.     Upon information and belief, and as Caldwell expects to establish on further investigation and discovery, Ratliff improperly retained, used, and/or disclosed (and continues to retain, use, and/or disclose) to McHugh, Caldwell's confidential business information. Specifically, Caldwell expects to show that Ratliff retained its trade secrets based on conduct that includes her theft of Clarivoy's login credentials, her **hundreds** of trespasses into Caldwell's CRM for the fourteen months following her departure from the company, and her unauthorized downloads of the information contained therein.

75.     Ratliff engaged in this nefarious conduct despite having a duty to maintain the secrecy of the information on Caldwell's CRM and to limit its use, which duty Ratliff owed and continues to owe Caldwell as a former agent, employee, and representative of Caldwell.

76.     Ratliff's actions create the strong likelihood that McHugh will use and exploit the confidential and trade secret information which Ratliff stole from Caldwell to solicit and acquire Caldwell's current and prospective customers and employees.

77.     Ratliff has engaged in this conduct as a management-level employee of McHugh, which means that her actions are imputed to McHugh.  Additionally, McHugh has endorsed Ratliff's conduct by failing to exercise any meaningful oversight over them – even after being confronted with clear statements regarding her wrongdoing – and by benefiting directly from her actions.

78. As a direct and proximate result of Defendants Ratliff and McHugh's actual and threatened misappropriation of Caldwell's trade secrets, Caldwell has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Ratliff is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Caldwell.

79. To the extent that Ratliff has already provided Caldwell's trade secrets or other confidential information to third parties, those parties should also be ordered to return and/or destroy that information.

80. As a direct and proximate result of Defendants' misappropriation, Caldwell has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

81. Each of the acts of misappropriation, as alleged in Count I, was done maliciously by Defendants, thereby entitling Caldwell to exemplary damages to be proved at trial.

## COUNT II
## VIOLATIONS OF THE OHIO UNIFORM TRADE SECRETS ACT
### (Against Defendants Ratliff and McHugh)

82. Caldwell re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

83. The information that Ratliff accessed on Caldwell's CRM constitute trade secrets, pursuant to O.R.C. § 1333.61, because Caldwell derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

84.     Caldwell took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Ratliff) were subject to obligations to maintain their secrecy.

85.     Ratliff obtained the information contained in Caldwell's CRM by improper means by pilfering Clarivoy, an authorized user's, login credentials, and accessing the CRM without consent in violation of her obligations to Caldwell.

86.     Upon information and belief, Ratliff also downloaded and retained non-public current and prospective customer's contact information contained in the CRM.

87.     Ratliff's foregoing conduct constitutes an actual and threatened misappropriation and misuse of Caldwell's trade secret information in violation of the Ohio Uniform Trade Secrets Act.

88.     Upon information and belief, and as Caldwell expects to establish on further investigation and discovery, Ratliff improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) to McHugh, Caldwell's confidential business information. Specifically, Caldwell expects to show that Ratliff retained its trade secrets based on conduct that includes her theft of Clarivoy's login credentials and her **hundreds** of trespasses into Caldwell's CRM following her departure from the company.

89.     Ratliff willfully and maliciously misappropriated Caldwell's trade secrets, by among other acts, using and disclosing Caldwell's trade secrets without authorization (express or implied) at a time that she knew or had reason to know that she had a duty to Caldwell to maintain the secrecy and confidentiality of the trade secrets contained in Caldwell's CRM, and to limit its use, instead of using them for her professional advancement and for the benefit of McHugh

17

90.     Ratliff's actions create the strong likelihood that McHugh will use and exploit the confidential and trade secret information which Ratliff stole from Caldwell to solicit and acquire Caldwell's customers and prospects, and Caldwell's employees.

91.     Further, Ratliff has engaged in this conduct as a management-level employee of McHugh, which means that her actions are imputed to McHugh.  Additionally, McHugh has endorsed Ratliff's conduct by failing to exercise any meaningful oversight over her and by directly benefiting from Ratliff's actions.

92.     As a direct and proximate result of Defendants Ratliff and McHugh's actions, Caldwell has suffered and/or will suffer damages.

93.     The actions of Defendants Ratliff and McHugh, as alleged in Count II, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Caldwell.

## COUNT III
## VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
### (Against Defendants Ratliff and McHugh)

94.      Caldwell re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

95.     Ratliff has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing Caldwell's computer systems and software – including Caldwell's CRM – which are used for interstate commerce or communication, without authorization and by exceeding authorized access to such systems and software and by retaining and transferring information from such protected systems and software, and so causing significant damage.

96.     Ratliff has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by knowingly, and with intent to defraud Caldwell through her wrongful actions, accessing

FP 43763825.3

Caldwell's computer systems and software, which are protected computers, without authorization or by exceeding authorized access to such systems and software, and by means of such conduct, furthering her intended fraud. Ratliff accessed Caldwell's protected computer system after her employment with Plaintiff had ended and after her authorization to access Caldwell's computer system had been revoked to obtain information from Caldwell's protected computer.  As such, Ratliff obtained and misappropriated significant and critical confidential and trade secret information relating to Caldwell's current and prospective customers, vendors, services, pricing information, sales notes, and more.

97.     Ratliff has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing Caldwell's computer systems and software, beyond the scope of the authorization granted, causing damage to Caldwell and its computers, recklessly or without due regard for her actions. Caldwell's IT policies and protocols plainly identified its computer systems and software, including its CRM, and its contents as Caldwell property, and Ratliff was prohibited from accessing any Caldwell databases, including its CRM and was required to return all original and copies of Ratliff information intact and immediately after her employment ended.

98.     Ratliff's aforementioned conduct caused one or more persons loss and damage during any one-year period aggregating at least $5,000.

99.     The Caldwell computer systems and software that Ratliff accessed, as described above, are "protected computers" within the meaning of 18 U.S.C. § 1030.

100.    Ratliff has engaged in this conduct as a management-level employee of McHugh, which means that her actions are imputed to McHugh.  Additionally, McHugh has endorsed Ratliff's conduct by failing to exercise any meaningful oversight over and by benefiting directly from her actions.

19

FP 43763825.3

101.    These actions taken by Ratliff and McHugh are direct violations of the Computer Fraud and Abuse Act—at a minimum, 18 U.S.C. §§ 1030(a)(2), 1030(a)(4), 1030(a)(5), and have harmed Caldwell, including, without limitation, harm to Caldwell's trade secrets and confidential information, including data, metadata, programs, systems, and other information, and impairment of the integrity and availability of data, metadata, programs, systems, and other information.

102.    Caldwell has also suffered damage and loss through the cost of responding to the offenses.

103.    Ratliff and McHugh's actions also entitle Caldwell to injunctive relief pursuant to 18 U.S.C. § 1030(g), since they have caused and will continue to cause Caldwell irreparable injury. Damages, alone, are not adequate to compensate Caldwell for these actual and threatened injuries. Caldwell also seeks all other remedies available to it under the law, including actual and consequential damages, attorneys' fees, costs, and punitive damages.

## COUNT IV
## UNFAIR COMPETITION
### (Against All Defendants)

104.    Caldwell re-alleges and incorporates by reference the preceding paragraphs as if set forth herein.

105.    Defendants' disclosure of Caldwell's confidential information, utilization of such confidential information for Defendants' benefit, and Ryan and Ratliff's deliberate and intentional violations of their obligations to Caldwell constitute acts of unfair competition.

106.    Upon information and belief, Defendants have wrongfully interfered with Caldwell's contractual relationships and business expectancies by using the confidential information that Ratliff misappropriated from Caldwell.

FP 43763825.3

107.    McHugh has engaged in pattern of illegal hiring activity of Caldwell employees where McHugh has induced and conspired with those individuals to misappropriate Caldwell's confidential information and trade secrets and/or breach their employment agreements with Caldwell.

108.    Because of Defendants' multiple acts of unfair competition, Caldwell has and is being subject to irreparable harm and damages entitling Caldwell to an award of injunctive and monetary damages.

109.    Caldwell has suffered damages as a result of the wrongful conduct committed by Ratliff, Ryan and McHugh, and McHugh is liable to Caldwell under principles *respondeat superior* and vicarious liability for Ryan and Ratliff's conduct.

<u>**COUNT V**</u>
**BREACH OF CONTRACT**
**(Against Ryan)**

110.    Caldwell re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

111.    Ryan executed a non-solicitation agreement with Caldwell (defined previously as the "Ryan Agreement") which imposed upon him contractual obligations including, among other things, restrictions prohibiting against the solicitation of Caldwell employees.

112.    The Ryan Agreement between Caldwell and Ryan is a valid and enforceable contract.

113.    Ryan is subject to and legally bound by the promises made in the Ryan Agreement.

114.    The restrictive covenants in the Ryan Agreement are reasonable as to time, geographic scope, and scope of restrained activity.  The Ryan Agreement does not impose restraints on Ryan that are greater than necessary to protect Caldwell's interests.

FP 43763825.3

115.     By inducing, encouraging, and soliciting at least one Caldwell employee to leave his/her employment with Caldwell to, instead work for McHugh, a competitor of Caldwell's, Ryan breached the Ryan Agreement.

116.     The Ryan agreement also imposed upon him contractual obligations regarding restrictions on the use and disclosure of Caldwell's confidential and trade secret information.

117.     The limitations on the use and disclosure of Caldwell's confidential information and trade secrets in Caldwell's employment agreements are reasonable.

118.     As a direct and proximate result of Ryan's breach of his contractual obligations, Caldwell has and is being subject to irreparable harm and damages entitling Caldwell to an award of injunctive relief and monetary damages.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against McHugh)**

119.     Caldwell re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

120.     As set forth herein, Ryan entered into a valid and enforceable non-solicitation agreement with Caldwell which imposed certain restrictions and obligations upon Ryan including but not limited to: (1) misusing any of Caldwell's confidential information or trade secrets; or (2) prohibiting employees who separate from Caldwell from soliciting, inducing, or enticing Caldwell employees (whether directly or indirectly) for a period of two (2) years after separation of employment.

121.     Upon information and belief, McHugh was aware that Ryan was subject to the foregoing covenants and restrictions.

22

122.    McHugh intentionally and without justification interfered with Caldwell's contractual relationship with Ryan by inducing, aiding and abetting, and encouraging him to violate his contractual covenants and restrictions with Caldwell. McHugh has also intentionally and without justification interfered with Caldwell's contractual relationship with other employees who are subject to similar covenants and restrictions by hiring away such employees from Caldwell and inducing, aiding and abetting them to violate their own employment agreements.

123.    McHugh's intentional interference with Caldwell's contractual relationship with Ryan directly and proximately caused material breaches of the Ryan Agreement, causing Caldwell to suffer irreparable harm and damages.

124.    McHugh has acted and is acting with an improper motive and through improper means to procure the breach of, and intentionally interfere with, Caldwell's contractual relationships with Ryan and other Caldwell employees by supporting and encouraging them to disregard their contractual obligations and obtaining and benefitting economically from their actions to the detriment of Caldwell.

125.    As a direct and proximate result of McHugh's conduct in this regard, Caldwell has suffered and will continue to suffer irreparable harm and damages.

126.    McHugh's actions, as described in this Count, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Caldwell, entitling Caldwell to punitive damages.

## COUNT VII
## UNJUST ENRICHMENT
### (Against all Defendants)

127.    Caldwell re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

FP 43763825.3

128.    As a result of their misconduct as alleged in herein, Defendants have been unjustly enriched or will be unjustly enriched through the use of Caldwell's confidential, proprietary and trade secret information by allowing them to avoid developing McHugh's own confidential and proprietary information and, upon information and belief, the solicitation, switching and converting of Caldwell's employees and customers to McHugh.

129.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

## JURY DEMAND

Caldwell respectfully demands a trial by jury on all counts.

24

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts complained of, Plaintiff Bob Caldwell Automotive, Inc. respectfully requests that this Honorable Court enter one or more orders granting them the following relief:

A.  A temporary restraining order, preliminary injunction, and a permanent injunction requiring Defendants (and any persons acting in concert with them or on their behalf) to:

1.  return all Caldwell property, including property in electronic form, in their possession and forbidding them from using, disclosing or acquiring said property (as well as any work product derived from Caldwell property);

2.  permanently enjoining Defendants from using or disclosing any of Caldwell's confidential, proprietary or trade secret information or records which Ratliff misappropriated from Caldwell and/or which Defendants have retained in their possession, custody or control; provide a full and complete accounting of all electronic devices, email accounts, cloud-storage accounts, and other devices/accounts that have access to any of the information that Ratliff improperly downloaded as stated in the Complaint;

3.  require Defendants to take all necessary efforts to ensure that all electronic devices, email accounts, and cloud storage accounts do not have access to any of Caldwell's trade secrets, confidential information, and/or proprietary information;

4.  take all necessary steps to preserve all potentially relevant evidence regarding the allegations in the Complaint, including, but not limited to, all indicia and

potential evidence relating to Ratliff's misappropriation of Caldwell's trade secrets and confidential/proprietary information, and McHugh's potential access of that same information by (i) any McHugh employee and/or (ii) any and all electronic devices, email accounts, cloud-storage accounts, and the like within its possession, custody or control;

5. comply with the obligations in the Ryan Agreement with Caldwell, including but not limited to the confidentiality and non-solicitation provisions; and

6. make available for inspection and imaging any computers, external storage devices, mobile devices, and all personal Cloud and email accounts used or accessed by Ryan and Ratliff to determine the full extent of Defendants' access, possession, retention, and use of Caldwell's confidential information or trade secrets;

B. An extension of the length of the restrictive covenants set forth in the employment agreement for Ryan for the same amount of time that he has been in violation of the same;

C. Judgment in favor of Caldwell and against Ryan, Ratliff and McHugh;

D. An award to Caldwell of actual and compensatory damages in an amount to be proven at trial;

E. An award to Caldwell of punitive and/or exemplary damages;

F. An award to Caldwell of pre-judgment and post-judgment interest;

G. An award to Caldwell of its reasonable attorneys' fees and its costs incurred in this action; and

H. Such other and further relief as this Court deems just and proper.

26

FP 43763825.3

Dated this 28th day of April 2022.

Respectfully submitted,

BOB CALDWELL AUTOMOTIVE, INC.
By Counsel

By:    s/ Anthony D. Dick
        Anthony D. Dick
        Ohio Bar No. 0084913
        FISHER & PHILLIPS LLP
        200 Public Square, Suite 4000
        Cleveland, Ohio 44144
        Telephone: 440.740.2147
        tdick@fisherphillips.com

        Jason K. Roberts
        (*pro hac vice to be filed*)
        Pennsylvania Bar No. 210023
        FISHER & PHILLIPS LLP
        Two Logan Square, 12th Floor
        100 N. 18th Street
        Philadelphia, PA 19103
        Telephone:  610.230.6114
        jroberts@fisherphillips.com
        COUNSEL FOR PLAINTIFF
        BOB CALDWELL AUTOMOTIVE, INC.

.

<u>**VERIFICATION**</u>

I, Justin Harmon, General Manager for Bob Caldwell Automotive, Inc., do hereby state that I have read the foregoing Verified Complaint for Damages and Injunctive Relief, and that the facts contained therein are true and correct to the best of my personal knowledge, information, and belief.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on this 26 th day of April, 2022

By: _____
Justin Harmon

FP 41379822.1